IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| STATE OF WASHINGTON, | ) | |
|---|---|---|
| | ) | No. 70993-3-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| DANTE PIGGEE, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: January 12, 2015 |

SPEARMAN, C.J. — Dante Piggee appeals his conviction of felony violation of a court order, claiming the trial court violated his right to equal protection when it allowed the prosecutor to use peremptory challenges to remove two of three African American women from the jury panel. Because Piggee fails to establish clear error in the trial court's ruling, we affirm.

## FACTS

Dante and Destany Piggee married in 2008 and have three children. Destany obtained a temporary protection order against Piggee in March 2013. Late in the evening of April 8, 2013, Piggee approached Destany in the parking lot behind her apartment, asking to speak to her. Destany told him to leave her alone and he left. A few minutes later, Piggee came to Destany's back door. While Destany prepared food in her kitchen and began cooking on the barbeque grill on her back porch, Piggee questioned her about her Facebook page and argued with her. At one point, one of their children came outside to Piggee and didn't "want to let her dad go," until he carried her back to the door and let her

down. Verbatim Report Proceeding (6/26/13) at 94. Destany repeatedly told Piggee to leave. Piggee continued to argue and became more aggressive, finally threatening to shoot her in the face. Irate, Destany told him she was "going to invoke my restraining order," and called the police. VRP (6/26/13) at 95. While she spoke on the phone, Piggee left through the back door. Destany heard a "boom," and went out to her back porch to find her grill lying flat on its back with the lid open, the food spilled out, and the burners popped out. VRP (6/26/13) at 97.

The State charged Piggee with felony violation of a court order and third degree malicious mischief.

During jury selection, Piggee, who is African American, used his first peremptory challenge to strike juror 14, an African American man who worked as a police detective. The prosecutor used her third peremptory challenge to strike an African American woman, juror 16. The prosecutor accepted the panel after exercising five peremptory challenges. After Piggee exercised another peremptory challenge, juror 35, an African American woman, entered the jury box. When the prosecutor used a peremptory challenge to strike juror 35, Piggee raised a challenge under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), objecting to the prosecutor's dismissal of jurors 16 and 35.

Following a discussion on the record regarding whether Piggee had established a prima facie showing of purposeful discrimination, the trial court was "a bit troubled by the fact that the State did exercise peremptory challenges

2

against two of the three African American women in the jury box," and asked the State to provide race-neutral explanations, "for safety's sake and to protect the record." VRP (6/25/13) 96-97.

The prosecutor recounted the story told by juror 35 that she had been the protected party to a court order and had chosen not to report a violation when the restricted party visited their child at daycare "because no one got hurt, no one was harmed." VRP (6/25/13) at 98. The prosecutor "had reservations" about the potential for juror 35 "not following the law" because her experience was similar to the facts of Piggee's case, which involved the presence of children and no physical harm. VRP (6/25/13) at 98. The prosecutor stated that juror 16 "did not tend to actually answer the questions" during voir dire and "was not able to articulate her true role as a juror." VRP (6/25/13) at 99. According to the prosecutor, juror 16 also suggested that "some spouses take advantage of the situation" by "using no contact orders as swords rather than a shield." VRP (6/25/13) at 99. The prosecutor "felt very uncomfortable" with juror 16 "passing judgment upon Destany Piggee even though the obligation solely lies with Mr. Piggee to obey the order." VRP (6/25/13) at 100.

Defense counsel argued that other jurors said that people may take advantage of others with no contact orders and other jurors failed to directly answer questions and could not articulate the true role of the jury. But defense counsel was not able to identify particular jurors remaining in the jury box who would have been subject to the same reasons for a challenge because she "didn't take notes on every single one of them." VRP (6/25/13) at 101.

3

The trial court acknowledged noting that juror 35 expressed "her feeling that it wasn't necessary to report a violation of a no contact order when no one got hurt." VRP (6/25/13) at 103. The court then ruled,

> [B]ased on what's been proffered to me and based on my notes and my recollection of what other members of the [venire] who are in the jury box at the present time said or failed to say, I cannot make a finding that the State's explanations for excusing on peremptory challenges Jurors 16 and 35 are pretexual[.]

VRP (6/25/13) at 103.

The jury found Piggee guilty of felony violation of a court order and acquitted him of malicious mischief. The jury returned a special verdict finding that the violation of the court order was part of an ongoing pattern of domestic violence. The trial court imposed a prison-based drug offender sentencing alternative.

## ANALYSIS

Piggee argues that the trial court violated his Fourteenth Amendment right to equal protection when it sustained the State's peremptory challenges to jurors 16 and 35.

The equal protection clause of the Fourteenth Amendment prevents a party from challenging a potential juror solely based on race. Batson, 476 U.S. at 85-86. Batson established a three-part test to determine "whether a venire member was peremptorily challenged pursuant to discriminatory criteria." State v. Rhone, 168 Wn.2d 645, 651, 229 P.3d 752 (2010). First, the party alleging such discrimination must establish a prima facie case of purposeful discrimination. Rhone, 168 Wn.2d at 651. Second, the burden shifts to the other party who must

provide a race-neutral explanation for challenging the potential juror. Rhone, 168 Wn.2d at 651. Finally, the trial court determines whether the challenging party has established purposeful discrimination. Rhone, 168 Wn.2d at 651. The defendant carries the burden of proving the existence of purposeful discrimination. Batson, 476 U.S. at 93.

"'In reviewing a trial court's ruling on a Batson challenge, [t]he determination of the trial judge is accorded great deference on appeal, and will be upheld unless clearly erroneous.'" Rhone, 168 Wn.2d at 651 (alteration in original) (quoting State v. Hicks, 163 Wn.2d 477, 486, 181 P.3d 831 (2008)). If there are two permissible views of the evidence, the trial court's choice between them cannot be clearly erroneous. State v. Luvene, 127 Wn.2d 690, 700, 903 P.2d 960 (1995). If the prosecutor provided a race-neutral explanation and the trial court ruled on the question of racial motivation, "the preliminary prima facie case is unnecessary." Luvene, 127 Wn.2d at 699.

Piggee points out that the prosecutor failed to question juror 35 as to whether she would be willing to follow the law despite her experience. He also claims the prosecutor failed to sufficiently question juror 35 about the details of her experience to determine whether her experiences were similar to the present case. Lack of questioning before dismissing a juror can be evidence of racially motivated dismissal. Hicks, 163 Wn.2d at 491 (prosecutor's failure to orally question only remaining African American juror about all his stated reasons for dismissing her was sufficient evidence to support prima facie inference of discrimination).

But juror 35 talked about her "ex" violating a protection order to see their son when defense counsel was questioning the venire and counsel asked juror 35 twice whether she could be fair and impartial in this case, given her experiences. VRP (6/24/13) at 135-37. The prosecutor later returned to juror 35, asking why she chose not to report the violation of the order, whether she would have chosen differently if the circumstances had been different, and whether having a protection order gave her a sense of comfort or assurance. VRP (6/25/13) at 10-12. When the prosecutor offered her explanation for excusing juror 35, she stated:

> [T]he core of the reason why I did not believe she was a good fit for this case was she said that, in the past, he had violated the no contact order by visiting the children, but she did not call the police because no one got hurt, no one was harmed. And I think here in this case, though we do have a threat to kill, it was not charged in this case because she – Destany Piggee did not articulate any fear of the actual threat. So we don't have any physical harm, we just have the allegation that he came over to her house and he would leave when requested.

VRP (6/25/13) at 98.

Because the prosecutor directly questioned juror 35 about her admitted failure to report a violation that did not result in any physical harm, which she identified as the specific source of her concern, we cannot say that her failure to ask for additional details or repeatedly question the juror's willingness to follow the law necessarily demonstrates discriminatory intent based on race.

Piggee also points to the fact that the prosecutor did not excuse jurors 15 and 34, who were not African American, although they expressed opinions similar to juror 35 about the need for cooperation of the people involved as well

6

as the police in order to make a protection order effective. But the defense exercised a peremptory challenge to excuse juror 15 before the prosecutor excused juror 35. And juror 34, who the prosecutor accepted on the panel but the defense excused, did not report having any personal experience with a protection order, either as a protected or a restrained party. Under these circumstances, we cannot say that the trial court's acceptance of the prosecutor's explanation for excusing juror 35 was clearly erroneous.

As to juror 16, Piggee claims that other jurors expressed a similar view that some people take advantage of protection orders to influence decisions in dissolution proceedings or proceedings involving children. In particular, Piggee claims that the prosecutor's acceptance of jurors 37 and 30 raises a strong inference that her explanation for excusing juror 16 was a pretext for racial discrimination.[1]

During voir dire, Juror 37 said his former wife obtained a protection order against him when they were going through a divorce and then called him on the phone. He said he could be fair and impartial unless he "found out that [Piggee's] wife or ex-wife or whatever she is called him first." VRP (6/24/13) at 144-45.

Juror 30 revealed that his sister had been the respondent to a protection order obtained by her husband's ex-wife, but he believed that she had been treated fairly in the process and that he could be impartial despite his knowledge of her experiences. Juror 30 also admitted his difficulty in presuming the

---

[1] We note that jurors 30 and 37 did not enter the jury box until after the State excused juror 16. Although the prosecutor accepted the panel with juror 30, Piggee used his last peremptory challenge to excuse juror 30. Juror 37 ultimately served on the jury.

innocence of a person who had two prior convictions for the same crime without some evidence of a change in his life.[2]

Juror 16 shared that her aunt and the mother of a close friend had both been physically abused by their ex-husbands. When defense counsel asked whether her knowledge of those situations would make it difficult for her to be fair and impartial, juror 16 stated she had "heard of like other situations in which the wife or the other spouse will take advantage of the system." VRP (6/24/13) at 147. Until defense counsel asked a question about her job, Juror 16 continued to elaborate on a "very unfair" example of a friend's brother's divorce, which involved "the wife" was "cheating," the husband giving "all the money to her because of the court," and the husband taking primary responsibility for the children. VRP (6/24/13) at 147-48. The prosecutor asked juror 16 generally about whether and why she believes domestic violence occurs and whether help is available. Juror 16 spoke about status in society, differing qualities of schools, limitations on access to resources, and people judging one another "by race" or "by your sexuality." VRP (6/24/13) at 110-11.

In response to Piggee's <u>Batson</u> challenge, the prosecutor admitted that her explanation for her peremptory challenge to juror 16 had "a little bit more of a nuance." VRP (6/25/13) at 99. The prosecutor observed that juror 16 "had a lot of statements" but "did not tend to actually answer the questions," such that the prosecutor was concerned as to whether "she could actually be a good juror,"

---

[2] After a lengthy discussion, the trial court denied defense counsel's challenge to juror 30 for cause.

"based on her life experience or the fact that she was not able to articulate her true role as a juror." VRP (6/25/13) at 99.

Piggee does not argue that the prosecutor's description of juror 16's statements was inaccurate or that either juror 37 or juror 30 made lengthy tangential statements or failed to directly answer questions. Although juror 30 notably struggled with his ability to presume the innocence of a person twice convicted of the same crime, the record does not indicate that he failed to describe his views clearly. Given the support in the record as a whole for the prosecutor's explanation of the peremptory challenge to juror 16, we cannot say that the trial court's decision regarding purposeful discrimination was clearly erroneous. See, e.g., Luvene, 127 Wn.2d at 700-01 (where four other jurors in venire had relatives with criminal histories or were ambivalent about the death penalty, but only challenged juror had both traits, trial court's decision that prosecutor's motivation was race neutral was not clearly erroneous).

In his statement of additional grounds for review Piggee claims he was denied his right to a fair trial when juror 9 was allowed to remain on the jury to consider the special verdict on the aggravating factor. A review of the record reveals that after the general verdict, but before the aggravating factor was submitted to the jury, the court informed the parties, outside the presence of the jury, that juror 9 had expressed concerns to the bailiff regarding Piggee's reaction to the verdict. The court stated that Juror 9 reported to the bailiff that Piggee "looked at her, and it made her feel uncomfortable, it made her feel like there was some kind of accusatory intent[.]" VRP (7/2/13) at 19. After the parties agreed to

have juror 9 come into the courtroom for voir dire and the court consulted the bailiff, the court stated on the record, "She doesn't want to come out if Mr. Piggee is in the courtroom, and obviously he's going to be in the courtroom. Now what?" VRP (7/2/13) at 24. After a lengthy discussion on the record and over Piggee's objection, the trial court brought the jury into the courtroom and questioned each juror as to whether he or she had "[a]ny concerns about your ability to be fair and impartial and ... presume the nonexistence of the aggravating factor?" VRP (7/2/13) at 35-36. Each juror answered, "No." VRP (7/2/13) at 35-36.

Piggee contends that the trial court improperly denied him an opportunity to question juror 9 about her reported fear and her subsequent contradictory statement on the record. He also cites the following circumstances to support his claim that juror 9 was biased against him: (1) her "fond memory" of the brother of a witness; (2) her "attempt to get excused for "medical" reasons;" and (3) her "obvious ability & willingness to [malign] & persecute" him. Statement of Additional Ground at 3.

Decisions of whether a juror is impartial or whether a mistrial is required are matters of discretion for the trial court that will not be overturned on appeal absent abuse of that discretion. State v. Colbert, 17 Wn. App. 658, 664-65, 564 P.2d 1182 (1977). Although Piggee clearly disagrees with the trial court's assessment of juror 9's ability to be fair and impartial, nothing in the record demonstrates any abuse of discretion. We therefore cannot further consider this claim on direct appeal. State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

Affirmed.

Specimen, C.J.

WE CONCUR:

Appelwick, J.          Leach, J.